

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00147-CV

CHARTER OAK FIRE INSURANCE COMPANY

APPELLANT

V.

GENE SWANIGAN

APPELLEE

----------

## FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

This is an appeal from a judgment for Appellee Gene Swanigan on his workers' compensation claim. Appellant Charter Oak Fire Insurance Company argues in a single issue that the judgment—which ordered Charter Oak to pay benefits in accordance with the jury's finding by a preponderance of the evidence

---

[1]*See* Tex. R. App. P. 47.4.

that Swanigan's injury of May 18, 2006, was a producing cause of his reflex sympathetic dystrophy (RSD)/complex regional pain syndrome (CRPS)—is not supported by the evidence. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

In 2001, Swanigan was working on a barbeque pit at his home, and the lid shut on his right pinkie finger. He went to the emergency room and later to a specialist who performed surgery to put hardware in to correct his fracture. Swanigan did not have any problems following the surgery and was later hired by CarMax to perform auto reconditioning. He was able to lift 110- to 120-pound transmissions without pain.

Approximately five years after his initial injury, on May 18, 2006, Swanigan injured the same right pinkie finger when he turned to grab a wrench as he was working on an SUV; his finger got caught between the strut, CV axle, and spindle. Swanigan immediately knew that his finger was injured and went straight to management to file a report. Swanigan developed swelling and a large knot from the clear part of his fingernail to his knuckle. Swanigan also experienced "stabbing, aching pain" that radiated up his arm.

Swanigan tried to work the week after his injury, but the pain forced him to leave and to go to CareNow for treatment. Swanigan was given a baseball finger splint, but it did not alleviate the pain. Swanigan said that it hurt him to move his right pinkie finger. Swanigan went to CareNow weekly after the injury, and the

2

doctor told him that he had a contusion. Swanigan also underwent therapy for the injury at HealthSouth. Swanigan stated that "the pain just -- it's something that never goes away." Swanigan said that he was getting "a little worse" and asked to see a specialist. He was referred to Dr. Luiz Toledo.

In September 2006, Dr. Toledo removed from Swanigan's finger the hardware that had been inserted years earlier after the incident with the barbecue pit lid. The surgery did not relieve Swanigan's pain.

Dr. Toledo performed a second surgery on January 24, 2007, and removed scar tissue (a neuroma) that was compressing a nerve in Swanigan's right pinkie finger. Swanigan said that the procedure went "okay," but he still experienced pain. Swanigan stated that his pain level had consisted of "a lot of 10s" and that he had asked Dr. Toledo to take the tip of his right pinkie finger off. Dr. Toledo said that there was no need for that and also told Swanigan that he had done all he could for him.

In July 2007, Swanigan started seeing Dr. David B. Graybill, an anesthesiologist at North Texas Pain Recovery, for help dealing with the pain. Dr. Graybill's notes state that Swanigan presented with complaints of pain in the right upper extremity following a work-related injury dated May 18, 2006. The notes also state that Swanigan had "complaints of pain in his little finger with altered sensation, but also complaints of pain radiating up his arm and loss of use of his arm secondary to his pain." Swanigan described the feeling in his arm as a "burning. . . . real hard, high powered" pain that was like someone "had

3

plugged a[n] electric -- a 110 cord in the socket and felt like I had the naked end on my arm." Swanigan said that the burning sensation felt like a hot ice pack was stuck under his armpit all the time and that the sensation radiated up the side of his head, making him feel like he had a football helmet on or had "been hit with a few blows upside the head." Swanigan testified that the medication he had been prescribed "do all right but it don't do the best" and that he did not like the side effects, which included not being able to concentrate, being edgy, and not being able to sleep.

After Dr. Graybill's examination, he noted that Swanigan's

> [r]ight upper extremity reveals cool, clammy hand and forearm. He has altered sensation to light touch of the right finger with some allodynia noted in the right forearm and hyperalgesia. He has diminished grip strength, but he is able to fully bend his PIP joint of his little finger. He has no motion in the DIP joint of his little finger.

Swanigan stated that the summary above was true at the time of Dr. Graybill's examination because he could move his finger at the time. By the time of trial, however, he could not bend his finger at all because it had gotten worse.

Dr. Graybill's notes further stated, "Impression: Status post crush injury to the right hand. Chronic pain syndrome secondary to Chronic Regional Pain Syndrome, Type Two." Dr. Graybill concluded that Swanigan would benefit from sympathetic nerve blocks, and Swanigan had four such procedures over a month-long period.[2] Swanigan said that the sympathetic nerve blocks relieved

---

[2]Swanigan explained that the procedures were "more or less like a major surgery." He was placed in a small operating room, was administered oxygen,

4

the pain for a short while but did not provide long-term relief. When the pain returned, it was worse. Swanigan was treated by Dr. Graybill for approximately five months. Dr. Graybill prescribed a compression glove for Swanigan. Swanigan said that the glove holds in heat and helps cushion his hand if it gets bumped.

Dr. Graybill referred Swanigan to Dr. Charles E. Willis, II, an anesthesiologist, and Swanigan went to see him on March 14, 2008. Dr. Willis's notes were admitted into evidence. Dr. Willis had noted,

> Dr. Graybill has done stellate ganglion blocks which have helped [Swanigan] 100 percent for two days. The pain now is about a 6 and a half out of 10 on a visual scale with numbness and tingling in the right upper extremity. Pain is associated with changes in his hair and nail growth. The nails grow very thin and there is also increased perforation and burning in the right upper extremity as well as changes with the weather.

Swanigan testified that the nail on his right pinkie finger was growing deformed; was "real, real thin"; and was outgrowing the other nails. Dr. Willis further noted that Swanigan's pain was worse in the morning than at night and limited his ability to work, exercise, have fun, and have sex and that his pain increased with prolonged driving; Swanigan's pain decreased with lying down and medication. Dr. Willis determined from his assessment that Swanigan had RSD, which is another term for CRPS, of the right upper extremity. Dr. Willis concurred with Dr.

_____

and was monitored with electrical sensors while he was put to sleep. During the procedure, he received injections in his neck.

5

Graybill that stellate ganglion blocks had been effective and were warranted in Swanigan's case.

Swanigan saw Dr. Martin D. Solomon, a neurologist, on September 22, 2008. Dr. Solomon's progress note, which was admitted into evidence, states that Swanigan had received nerve blocks and that his hand was discolored;[3] Swanigan explained that sometimes his hand was a dull color and that sometimes it was a shiny color. Dr. Solomon concluded that Swanigan's symptoms were consistent with CRPS.

Dr. Mark A. Dirnberger, a pain management doctor, was treating Swanigan monthly at the time of the trial. Dr. Dirnberger prescribed Lyrica and hydrocodone for the pain. Dr. Dirnberger and Swanigan discussed a possible referral to have a spinal stimulator surgically implanted to treat his RSD/CRPS. Dr. Dirnberger's notes, which were admitted into evidence, state that he is going to assume Swanigan's pain management duties but that the remainder of Swanigan's other issues need to be managed by other physicians.

Swanigan testified that his pain affected his ability to live his life, even at the time of trial. He said that the chronic pain caused him to become easily irritated and to "snap." Swanigan said that the pain had affected his ability to

---

[3]The progress note is dated September 22, 2008, but at the bottom it states that it was dictated "08/08/08." Swanigan testified that he saw Dr. Solomon on September 22, 2008, and therefore we use that date.

6

father his children, including being unable to teach his daughter to drive and unable to play ball with his son.

At the time of the trial, Swanigan's pain was a six and a half on a scale of ten, and he was taking Ambien to sleep because the pain interfered with his ability to sleep. The pain in his dominant hand also affected his ability to grip and grasp. Swanigan said that he could write but that his handwriting was "awful" because his hand and whole arm twitched.

## B. Procedural Background

Charter Oak accepted the crush injury to Swanigan's right pinkie finger as part of his compensable injury, accepted the surgery to remove the previously inserted hardware from Swanigan's right pinkie finger as part of his compensable injury, and accepted the surgery to remove the neuroma from Swanigan's right pinkie finger as part of his compensable injury. Following a contested case hearing on the issue of whether Swanigan's compensable injury extended to and included RSD/CRPS, the Division of Workers' Compensation (DWC) hearing officer issued a decision that the compensable injury sustained by Swanigan did not extend to and include RSD/CRPS.

Swanigan appealed the hearing officer's decision. The DWC Appeals Panel adopted the hearing officer's decision and order.

Swanigan then appealed the DWC Appeals Panel's decision by filing suit in district court. After a two-day trial, the sole question presented to the jury in the court's charge asked:

7

Do you find from a preponderance of the evidence that Gene Swanigan's injury of May 18, 2006 was a producing cause of Gene Swanigan's reflex sympathetic dystrophy (RSD)/complex regional pain syndrome (CRPS)?

You are instructed that the Appeals Panel of the Texas Workers Compensation Commission (TWCC) affirmed the Contested Case Hearing officer's determination that Gene Swanigan's compensable injury did not extend to and include reflex sympathetic dystrophy (RSD)/complex regional pain syndrome (CRPS).

You are further instructed that you are not bound by the decisions of the Appeals Panel or the Contested Case Hearing officer. However you may consider their decisions as evidence and accord them such weight, if any, as you may choose.

Answer Yes or No.

Answer: <u>YES</u> [4]

Swanigan moved for judgment on the verdict, and the trial court ordered Charter Oak to pay benefits in accordance with the jury's verdict. Charter Oak now appeals. Charter Oak raises one issue on appeal, challenging various aspects of the legal and factual sufficiency of the evidence to support the jury's verdict.

---

[4]Swanigan objected to the charge, stating:

I think that the question should reflect the issue as adopted by the CCH administrative judge, which includes did the injury extend to [and] include the CRPS and RSD. I think the extend to and include need to be included as part of it.

The trial court overruled Swanigan's objection and submitted the above question. Charter Oak lodged no objections to the charge.

### III. CHARTER OAK'S FACTUAL SUFFICIENCY CHALLENGES

To the extent that Charter Oak's sole issue mounts challenges to various aspects of the factual sufficiency of the evidence, we hold that Charter Oak did not preserve any factual sufficiency complaints for our review. *See* Tex. R. Civ. P. 324(b)(2) (requiring a motion for new trial be filed to preserve a complaint of factual sufficiency to support a jury finding); *Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex. 1991) (recognizing motion for new trial raising factual sufficiency complaint is necessary to preserve that alleged error); *In re C.E.M*., 64 S.W.3d 425, 427 (Tex. App.—Houston [1st Dist.] 2000, no pet.) ("There is only one way to preserve a factual sufficiency challenge: include the complaint in a motion for new trial."). Charter Oak did not file a motion for new trial; thus, its factual sufficiency complaints are not preserved for our review. *See* Tex. R. Civ. P. 324(b)(2); *Cecil,* 804 S.W.2d at 510–11; *C.E.M*., 64 S.W.3d at 427. We overrule the portions of Charter Oak's sole issue that challenge the factual sufficiency of the evidence.

### IV. CHARTER OAK'S LEGAL SUFFICIENCY CHALLENGES

### A. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital

fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support a jury finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 77 S.W.3d 253, 262 (Tex. 2002). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

### B. Disposition of Charter Oak's Subissues 1, 3, 4, and 5

As to the legal sufficiency challenges raised by Charter Oak in its sole issue, Charter Oak argues that legally insufficient evidence exists to "establish

10

that Mr. Swanigan suffered from complex regional pain syndrome and that his compensable injury was a producing cause of that condition." Within its sole issue, Charter Oak raises five subissues, arguing (1) that expert opinion testimony was required, (2) Swanigan's expert testimony was conclusory, (3) Swanigan's expert opinion testimony contained an analytical gap, (4) Swanigan's expert opinion testimony failed to exclude other possible causes, and (5) Swanigan's other medical reports were insufficient to establish causation. We address these subissues as well as Charter Oak's two overarching legal sufficiency challenges.

In subissue one, Charter Oak argues that expert testimony is required to support a diagnosis of CRPS. Case law supports Charter Oak's argument, *see City of Laredo v. Garza*, 293 S.W.3d 625, 632 (Tex. App.—San Antonio 2009, no pet.) (stating that laypersons do not have the common knowledge and experience to adequately evaluate the cause of CRPS), and, as set forth below, Swanigan provided expert testimony concerning his diagnosis of CRPS through Dr. Graybill's testimony and through the medical records of Dr. Graybill, Dr. Toledo, Dr. Willis, and Dr. Solomon. We overrule Charter Oak's first subissue.

Concerning subissue three, Charter Oak did not object to the expert opinion testimony presented by Dr. Graybill; thus, on appeal Charter Oak may challenge only whether Dr. Graybill's testimony was conclusory and therefore constituted no evidence. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009) (explaining that an objection is required to preserve an appellate

11

challenge to an expert's reliability, methodology, technique, or the foundational data used by the expert); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004) (holding that an objection to expert testimony is not required to preserve a no-evidence challenge to conclusory expert testimony); *In re Conley*, No. 09-10-00383-CV, 2011 WL 4537938, at *5 (Tex. App.—Beaumont Sept. 29, 2011, no pet.) (mem. op.) (holding that reliability challenge regarding an analytical gap was not preserved for appellate review in the absence of an objection). Because Charter Oak did not object to Dr. Graybill's testimony, we hold that Charter Oak's analytical-gap complaint concerning Dr. Graybill's testimony is not preserved for our review. We overrule Charter Oak's third subissue.

Concerning Charter Oak's fourth subissue—its contention that Swanigan's expert opinion testimony is insufficient because it failed to exclude other possible causes—Charter Oak points to and we have located no evidence in the record of another cause for Swanigan's RSD/CRPS. A medical causation expert need not "disprov[e] or discredit[] every possible cause other than the one espoused by him." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir. 1987). When evidence of other plausible causes of the injury or condition is admitted, and that evidence could be negated, then the proponent of expert causation testimony should offer evidence negating the other plausible causes. *See Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex. 1997). But here, no evidence

was admitted of other plausible causes of Swanigan's RSD/CRPS.[5]  Moreover, the jury question required the jury to find only that Swanigan's May 18 injury was *a* producing cause of his RSD/CRPS, and the jury was specifically instructed that "[t]here may be more than one producing cause."  Thus, in this case, based on the record before us and the charge given, the jury was not required to find that all other possible causes of Swanigan's RSD/CRPS had been excluded, and Swanigan's expert was not required to give testimony excluding all other possible causes for his RSD/CRPS.  We overrule Charter Oak's fourth subissue.

In its fifth subissue, Charter Oak complains that Swanigan's other medical reports were insufficient to establish causation.  No requirement exists, however, that Swanigan's other medical records independently establish causation.  Moreover, Charter Oak did not object to the admission of the medical records/reports of Dr. Graybill, Dr. Toledo, Dr. Willis, or Dr. Solomon.  These unobjected-to medical records support Dr. Graybill's expert causation testimony.  We overrule Charter Oak's fifth subissue.  *See generally State Office of Risk Mgmt. v. Escalante*, 162 S.W.3d 619, 625 (Tex. App.—El Paso 2005, pet. dism'd) (holding evidence, which consisted of claimant's testimony and medical records of treating physician, legally sufficient to support jury's findings on

---

[5]To the extent that Swanigan's prior injury to his right pinkie finger could be considered an "other possible cause," Swanigan did refute this via his testimony that his right pinkie finger was fine after the barbeque pit injury and that he could lift 110- to 120-pound transmissions without pain at Carmax prior to the May 18 injury.

compensable injuries sustained by Appellee to his lumbar and spine and in the form of cervical root lesions).

### C. Charter Oak Waived its Legal Sufficiency Complaint Concerning the Evidence that Swanigan Suffered from RSD/CRPS by Failing to Object to the Charge.

In its sole issue, Charter Oak asserts two overarching legal sufficiency challenges: first, that the evidence is legally insufficient to establish that Swanigan suffered from complex regional pain syndrome; and second, that the evidence is legally insufficient to establish that Swanigan's compensable injury was a producing cause of that condition. Concerning Charter Oak's legal sufficiency challenge to the evidence that Swanigan suffered from RSD/CRPS, we note that, as set forth above, the only question submitted to the jury in the court's charge was

> Do you find from a preponderance of the evidence that Gene Swanigan's injury of May 18, 2006 was a producing cause of Gene Swanigan's reflex sympathetic dystrophy (RSD)/complex regional pain syndrome (CRPS)?

Swanigan points out in his brief that this question assumes that Swanigan suffers from RSD/CRPS.

A jury question is objectionable if it assumes the existence of disputed facts. *See, e.g.*, *UMLIC VP LLC v. T & M Sales & Envtl. Sys., Inc.*, 176 S.W.3d 595, 608 (Tex. App.—Corpus Christi 2005, pet. denied) ("A submission to the jury is objectionable if it assumes a disputed fact in issue"). Typically, a jury question that assumes a disputed fact may be fixed upon objection by inserting

14

the phrase "if any" or by conditioning language at the beginning of the jury question. But Charter Oak did not assert any objection to the jury question here.

Because Charter Oak did not object to the charge, we are required to analyze its challenge to the legal sufficiency of the evidence in light of the charge given without objection. *See, e.g., Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (explaining that Wal-Mart's no-evidence challenge "must be made in light of the jury charge that the district court gave without objection"). And the charge actually given here—which asks only whether Swanigan's injury of May 18 was a producing cause of his RSD/CRPS—assumes Swanigan suffers from RSD/CRPS. The jury was not asked whether Swanigan suffered from RSD/CRPS; the jury was told that he did and asked only whether the May 18 injury was a producing cause of the RSD/CRPS.

Because the charge told the jury that Swanigan suffered from RSD/CRPS, and because Charter Oak did not object to the charge, we hold that Charter Oak has waived its legal sufficiency challenge to the evidence on whether Swanigan suffered from RSD/CRPS. We overrule Charter Oak's sole issue, including subissue two, to the extent that it challenges the legal sufficiency of the evidence to establish that Swanigan suffered from RSD/CRPS.[6]

---

[6]Below we nonetheless alternatively examine the legal sufficiency of the evidence to establish that Swanigan suffers from RSD/CRPS and conclude that legally sufficient evidence exists to establish that Swanigan suffers from RSD/CRPS.

**D. Alternatively, Legally Sufficient Evidence Exists that Swanigan Suffers From RSD/CRPS, and Legally Sufficient Evidence Supports the Jury's Finding that Swanigan's Injury was a Producing Cause of his RSD/CRPS**

We next address Charter Oak's contention, raised in its sole issue and its second subissue, that the evidence is legally insufficient to establish that Swanigan's May 18 injury was a producing cause of his RSD/CRPS.

We first set forth the expert opinion testimony heard by the jury.

### 1. Expert Opinion Testimony

Three experts testified: Dr. Graybill for Swanigan and Dr. Mitchell and Dr. Chandrakar for Charter Oak.

### a. Dr. David Bruce Graybill

Dr. Graybill is an anesthesiologist with a subspecialty in pain management. He has practiced medicine for over twenty-seven years and estimated that he had treated five to twenty patients per year with CRPS.

When Swanigan first saw Dr. Graybill on July 25, 2007, Swanigan's right upper extremity was cool, his hand and forearm were clammy, he had altered sensation to light touch of his right pinkie finger with some unusual pain sensations in his right forearm, he had weakened grip strength, and he was unable to bend the middle joint of his right pinkie finger. Dr. Graybill's diagnosis

was "[h]ealed crush injury to right hand, chronic pain syndrome with Chronic Regional Pain Syndrome Type II or causalgia."[7]

Dr. Graybill testified that the hallmark signs and symptoms of CRPS Type II are temperature changes, increased perspiration to the hand, color changes to the hand, and increased sensitivity to types of sensations or feelings that normally are not painful.  Dr. Graybill testified that Swanigan had each of these specific hallmark symptoms (except color change because Swanigan is African American).  Dr. Graybill explained that Swanigan's crush injury to his right hand and the required surgical excision of the neuroma from the nerve at the location of the crush injury caused Swanigan to establish a sympathetic mediated pain—a situation where the sympathetic nervous system is involved in creating an atypical pain pattern; this is Type II CRPS or causalgia.  Dr. Graybill testified that Swanigan's CRPS was caused by his May 18 on-the-job injury.

Dr. Graybill treated Swanigan's CRPS for over fourteen months; Dr. Graybill saw Swanigan between twenty-one and thirty times during that time period.  Dr. Graybill felt "fairly confident" about his diagnosis of CRPS and testified that his diagnosis did not change throughout the time that he treated Swanigan.

---

[7]Dr. Graybill said that CRPS was also known as Complex Regional Pain Syndrome.  Dr. Graybill further explained that Type I of CRPS is RSD and that Type II is causalgia.

On cross-examination, Dr. Graybill conceded that he was not familiar with the fourth edition or the fifth edition of the *AMA Guides* and did not use them or any peer-reviewed publications to obtain the criteria that he looked for in diagnosing CRPS; instead, the hallmark signs of CRPS that he testified about came from his training and experience.

Dr. Graybill assumed that Swanigan had undergone x-rays of his injured upper extremity and hand but said that he did not review them because it was not his practice to refer to a patient's x-rays in trying to determine whether a patient had CRPS. Dr. Graybill was not sure whether Swanigan had undergone a triple-phase bone scan and was not aware of what particular findings might be expected on a triple-phase bone scan of an individual who has CRPS.

Dr. Graybill testified that if an individual has CRPS, he would anticipate changes in the skin and possibly the hair growth on the affected body part, possible changes in the coloration in the nail bed, changes in the temperature of the affected extremity, sweating, and atrophy of the affected musculature. Regarding circulatory changes, Dr. Graybill would expect to see vasoconstriction, meaning diminished circulation, and explained that changes in air temperature may affect the extremity.

Dr. Graybill saw Swanigan a year after the accident, at which time he was in the chronic phase instead of the acute phase of his CRPS.[8] Dr. Graybill

---

[8]Dr. Graybill said that in the acute phase, it is very painful to move the joints.

testified that Swanigan's sympathetic mediated symptoms were very active but that they seemed to improve during the treatment with the sympathetic nerve blocks. For instance, Swanigan returned to work with limitations in July 2008, he had improved function and less pain, and the signs of the sympathetic mediated pain had lessened. The signs of the sympathetic mediated pain that had lessened included that on June 24, 2008, Swanigan's palm was of normal color, and the allodynia and hyperalgesia had gone away. However, some of Swanigan's symptoms returned after the nerve blocks wore off.

On October 14, 2008, Dr. Graybill wrote that it was necessary for him to withdraw from further professional attendance or treatment of Swanigan because Dr. Graybill did not feel like he could provide any further care to Swanigan, Swanigan desired more care, and Swanigan had asked for another doctor. Dr. Graybill explained that Swanigan wanted answers and solutions that Dr. Graybill was not able to provide. At the time that Dr. Graybill discontinued his physician-patient relationship with Swanigan, he felt that Swanigan was at a point of maximum medical improvement and that he had done all he could to help Swanigan. Dr. Graybill's opinion was that Swanigan still had CRPS on October 14, 2008, and that it was still chronic. Dr. Graybill said that most of his findings were subjective when he made the diagnosis of CRPS with Swanigan.

On redirect, Dr. Graybill said that no consistent objective findings exist for the diagnosis of CRPS; instead, some patients have some of the hallmark objective symptoms while other patients suffer from different hallmark objective

19

symptoms. Dr. Graybill reiterated that he had relied upon his twenty-seven years of training and experience in diagnosing CRPS.

Although Dr. Graybill was unaware of Swanigan's prior 2001 injury to his right pinkie finger, Dr. Graybill testified that if Swanigan had broken his right pinkie finger in 2001 and had experienced no CRPS symptoms after the 2001 break through the time of the work-related injury, those facts would strengthen his opinion that Swanigan's May 18, 2006 work-related injury caused his CRPS. Assuming that Swanigan did not have any signs or symptoms of CRPS from 2001 to 2007, Dr. Graybill's opinion would be that Swanigan's work-related injury caused his CRPS.

### b. Dr. William Horace Mitchell

Dr. William Horace Mitchell, an orthopedic surgeon, saw Swanigan at the request of the workers' compensation carrier.[9] Dr. Mitchell testified at his deposition, which was played at trial, that RSD is a "real controversial subject in medicine." The exact cause is not known as far as he can tell.

Dr. Mitchell relied on the *AMA Guides* in stating that the criteria for RSD are vasomotor changes (e.g., temperature regulation, color, swelling) and sudomotor changes (e.g. dry skin or increased sweating, decreased range of motion, atrophy of the skin). Atrophy could be of the hair, skin, or nails. Of the eight criteria for RSD, five are needed to make that diagnosis. Dr. Mitchell

---

[9]Swanigan testified that Dr. Mitchell's examination took less than ten minutes and that Dr. Mitchell did not touch him.

20

testified that the fifth edition of the *AMA Guides* expands the trophic changes of the criteria for CRPS, and eight out of eleven signs must be present for a diagnosis of CRPS. The criteria include color change; temperature change, cold usually; increased sweating; and dry skin, while the trophic changes include change in motion, nail changes, atrophy, shiny skin, and decreased range of motion from stiffness.

Dr. Mitchell testified that the objective tests that are recommended when attempting to diagnose or rule out RSD and CRPS are x-rays and triple-phase bone scans. An x-ray would show generalized osteoporosis or loss of bone substance (calcium) from the bones, while a triple-phase bone scan would show increased uptake by the radioactive dye around the joints of the extremity and would show periarticular changes. Dr. Mitchell testified that an x-ray or a triple-bone scan, in and of itself, is insufficient to diagnose RSD or CRPS.

Dr. Mitchell explained that stellate ganglion blocks may relieve pain in a patient who has the cardinal signs for RSD/CRPS. But he testified that even if a patient receives relief from the ganglion blocks, that is not enough to diagnose RSD/CRPS without the vasomotor, sudomotor, and trophic changes.

Dr. Mitchell examined Swanigan on January 7, 2009. Dr. Mitchell testified that Swanigan complained of pain in his right arm, which would be consistent with RSD/CRPS. But Dr. Mitchell's opinion, which was based on his examination of Swanigan and his review of the triple-phase bone scan, was that Swanigan did not have any of the objective findings or criteria to make a diagnosis of RSD. Dr.

21

Mitchell examined Swanigan's hand and found no vasomotor, sudomotor, or trophic changes. Dr. Mitchell testified that the triple-phase bone scan showed findings consistent with arthritis and trauma, not findings that would typically be seen with RSD. Dr. Mitchell testified that the x-ray showed evidence of old trauma involving the fifth finger, as well as some screws broken off in the middle bone of the finger. The radiology report indicated that the bone density was adequate; it did not mention any decreased bone density or diffuse osteoporosis. Dr. Mitchell did not believe that the work-related injury caused RSD or CRPS because he concluded that Swanigan did not have RSD or CRPS.

On cross-examination, Dr. Mitchell conceded that a crush injury is the type of injury that can lead to CRPS or RSD, though sometimes the CRPS or RSD does not set in immediately. Dr. Mitchell also agreed that the hallmark complaint of RSD is a burning sensation that is not explainable through the original injury. Dr. Mitchell testified that RSD would not occur immediately because the turnover in bone is slow, and it would take a while to appear. If Dr. Mitchell suspected that a patient had RSD, he would not treat the condition but would refer the patient to a pain management specialist or a neurologist.

Although Dr. Solomon had noted that Swanigan's finger was cool to the touch with edema, Dr. Mitchell did not feel any difference in temperature in Swanigan's finger and reported that Swanigan's nails were normal. Additionally, Dr. Mitchell was not aware that Dr. Willis, who was board certified in

anesthesiology, had noted on March 14, 2008, that Swanigan had positive trophic changes of the nail bed.

On redirect, Dr. Mitchell said that if he was trying to rule out RSD, then he would use the findings and signs in the *AMA Guides*. Dr. Mitchell testified that when he examined Swanigan, "[t]here were no objective findings on the physical examination that met any of those criteria [from the *AMA Guides*]."

Dr. Mitchell testified that any physician who runs a clinical practice should be able to diagnose CRPS or RSD. Thus, Dr. Mitchell testified that if a patient presented with no signs of RSD or CRPS but had subjective complaints of subjective symptoms, he would refer the patient to a neurologist because he could not make a diagnosis and that "[m]aybe it's something else."

Dr. Mitchell testified that Dr. Solomon's report and Dr. Willis's report concerning their examinations of Swanigan did not change his opinion because each report contained "isolated" findings—one documented swelling, coolness to the touch, edema, and subjective complaints of burning; the other documented pain and a trophic nail change—but not the "whole constellation" of findings for a diagnosis of RSD or CRPS.

### c. Dr. Kunjeelal Chandrakar

Dr. Kunjeelal Chandrakar, who is board certified in general surgery and runs a family practice part-time, examined Swanigan as a designated doctor.[10]

---

[10]Swanigan testified that Dr. Chandrakar's examination consisted of only questions and lasted less than ten minutes. Dr. Chandrakar told Swanigan as

Dr. Chandrakar testified that he did not have a lot of experience with patients who had signs of CRPS because he usually refers them to hand surgeons or to pain management if chronic pain develops. Dr. Chandrakar testified that he did not continue treating patients with chronic pain who were likely to develop serious problems.

Dr. Chandrakar examined Swanigan for the first time on September 21, 2007, as a designated doctor in order to address maximum medical improvement and impairment rating. During Dr. Chandrakar's examination of Swanigan, he did not notice (1) any change in skin color on the finger or hand, (2) any change in skin temperature, (3) any swelling or edema, (4) any skin dryness, (5) any changes in the skin texture, (6) any atrophy, or (7) any changes in the nails, but he did note that Swanigan had stiffness in the joint due to flexion deformity of the finger as a result of the injury. Page four of Dr. Chandrakar's report notes under "Neurological Examination" that Swanigan's "[s]ensation to pinprick and light touch was decreased in the right little finger, medial and lateral aspects." Dr. Chandrakar testified that he performed the pinprick test to check sensation and to identify whether there was a digital nerve injury. Dr. Chandrakar noted that Swanigan had hypersensitivity in his fingers on either side of the distal joint. Dr. Chandrakar found that Swanigan had no pain when his elbows, wrists, or hands

soon as he walked into the examining room that the insurance company did not recognize CRPS. Swanigan did not feel confident in Dr. Chandrakar's grasp of RSD/CRPS.

were palpitated. Dr. Chandrakar did not find anything in his evaluation that would lead him to conclude that Swanigan had CRPS.[11] Dr. Chandrakar's diagnosis of Swanigan was "[i]njury to the right little finger, crush injury; and a second diagnosis, excision of neuroma, right little finger."

Dr. Chandrakar examined Swanigan again on January 18, 2008, and found no changes from the previous exam. Dr. Chandrakar found no atrophy; the skin texture was normal; the sweat patterns, color, and temperature of the hand were normal; the venous circulation and capillary profusion were within normal limits; and there was no pain in response to palpitation of the elbows, wrists, and hands. The nails and hair growth on the hand were not mentioned in the report. Dr. Chandrakar testified that the hyperesthesia that Swanigan had on the initial examination could have been related to his initial nerve injury or to the neuroma that was excised. As of the second examination, it appeared that the hyperesthesia in the IP joint had resolved.

On cross-examination, Dr. Chandrakar agreed that hypersensitivity to stimuli is a hallmark sign of CRPS and that CRPS or RSD is difficult to diagnose. Dr. Chandrakar testified that in his normal practice, he does not make a diagnosis of RSD or CRPS; he refers out patients to get such diagnosis.

---

[11]Dr. Chandrakar was not aware that Swanigan had undergone a triple-phase bone scan, but he was aware that such scans are useful in diagnosing or ruling out CRPS.

## 2. Dr. Graybill's Testimony That Swanigan Suffered From RSD/CRPS Was Not Conclusory

Charter Oak argues in its second subissue that Dr. Graybill's testimony was conclusory and thus constitutes no evidence that Swanigan suffered from RSD/CRPS. We have previously held that Charter Oak waived any legal sufficiency complaint concerning whether Swanigan suffered from RSD/CRPS by failing to object to the jury question on the ground that it assumed this disputed fact. We nonetheless alternatively hold here that, in any event, Dr. Graybill's testimony that Swanigan suffered from RSD/CRPS was not conclusory but was based on the facts he discerned and documented during his fourteen-month treatment of Swanigan.

Specifically, Charter Oak contends that because Dr. Graybill was not familiar with the fourth and fifth editions of the *AMA Guides* and because he relied on his training and experience, rather than on x-rays or triple-phase bone scans, his diagnosis that Swanigan had CRPS and his opinion that the May 18 injury caused Swanigan's CRPS were conclusory.

As set forth above, Dr. Graybill did rely on his training and experience in diagnosing Swanigan with CRPS, but the criteria, the "hallmark symptoms," that Dr. Graybill discerned through his training and experience and that supported a diagnosis of CRPS were the same as most of the "clinical findings" set forth in the *AMA Guides*. Dr. Graybill's testimony, as well as his notes that were admitted into evidence without objection, reveal that in making the diagnosis that

26

Swanigan suffered from RSD/CRPS, he considered skin temperature changes, skin color changes, sweating, atrophy, changes in the nail bed, changes in the skin, range of motion limitations, and transient responses to stellate ganglion blocks. These considerations parallel the "clinical findings" that Charter Oak's expert Dr. Mitchell testified were required in order for someone to have a correct diagnosis of RSD/CRPS per the *AMA Guides*. Dr. Mitchell testified:

> The cardinal signs [of RSD per the *AMA Guides*] are what are called vasomotor changes and sudomotor changes. Vasomotor being temperature regulation, color, may cause swelling. Sudomotor is dry skin or increased sweating, decreased range of motion, atrophy of the skin are the sort of physical findings.
>
> Q. Okay. What is a trophic change?
>
> A. Trophic is really atrophy or wasting. It could be the hair or the skin, the nails, as far as this particular syndrome is concerned.
>
>      . . . .
>
> Q. Are all of those signs necessary or are only some of them necessary to be present?
>
> A. Usually some of them. The criteria for RSD, there are eight. And if you have five, you can make the diagnosis.
>
>      . . . .
>
> Q. Okay. What about complex regional pain syndrome, what are the signs or findings that are required in order to have that diagnosis?
>
> A. Well, in the 5th edition, it expands it a little. The guide to impairment expands it a little bit. It's pretty much the same, vasomotor and sudomotor, but it expands the trophic changes --
>
> Q. Okay.

27

A.    -- a little bit.  So it's color change; temperature, cold usually; increased sweating; dry skin.  And then the trophic changes can cause change in motion, nail changes, atrophy, shiny skin, decreased range of motion by getting stiff.  That's pretty much it.

Thus, we cannot say that Dr. Graybill's testimony based on his training and experience—using the same factors as Dr. Mitchell testified were used in the *AMA Guide*—was conclusory.  In fact, Dr. Graybill's testimony and the medical records in evidence from Dr. Graybill, Dr. Toledo, Dr. Willis, and Dr. Solomon document that Swanigan exhibited the very "clinical findings" that Dr. Mitchell testified were necessary to support a diagnosis of RSD/CRPS under the *AMA Guide*.  The record reflects that Dr. Graybill and Dr. Mitchell reached different conclusions as to whether Swanigan suffered from RSD/CRPS after looking at the same criteria.

An expert opinion is conclusory when it offers an opinion with no factual substantiation.  *See generally Coastal Transp. Co.,* 136 S.W.3d at 232; *Burrow v. Arce,* 997 S.W.2d 229, 236 (Tex. 1999).  Here, Dr. Graybill's opinions that Swanigan suffered from RSD/CRPS are not conclusory; the opinions are based on facts and criteria in the record documenting Dr. Graybill's fourteen-month treatment of Swanigan.

We therefore, in the alternative to our holding that Charter Oak waived its legal sufficiency challenge to whether Swanigan suffers from RSD/CRPS by failing to object to the charge, hold that the evidence is legally sufficient to support the jury's finding that Swanigan suffered from RSD/CRPS.

### 3. Dr. Graybill's Testimony that Swanigan's May 18 Injury Was a Producing Cause of His RSD/CRPS Was Not Conclusory

As set forth above, Dr. Graybill repeatedly testified that Swanigan's RSD/CRPS was caused by his May 18 on-the-job injury. Charter Oak offered no controverting evidence or testimony; Charter Oak's position was that Swanigan did not suffer from RSD/CRPS. We hold that Dr. Graybill's testimony and opinion that Swanigan's May 18, 2006 injury was a producing cause of his RSD/CRPS was not conclusory but was grounded in the facts he ascertained and documented in his medical records concerning Swanigan's symptoms and treatment. *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 220 (Tex. 2010) (holding that expert medical causation testimony was based on reliable foundation and was admissible to prove that May 2000 injury was producing cause of appellee's death and further holding that "we cannot disturb the jury's finding against [insurer] on the issue of producing cause").

### 4. Legal Sufficiency of All the Evidence to Establish Swanigan's May 18 Injury Was a Producing Cause of His RSD/CRPS

Because there was no objection to the jury charge, we review all of the evidence in the light most favorable to the verdict to determine whether a reasonable trier of fact could have formed a firm belief or conviction that Swanigan's injury of May 18 was a producing cause of his RSD/CRPS. *See Sturges*, 52 S.W.3d at 715.

Swanigan testified that his right pinkie finger was fine after the barbeque pit injury; he said he could lift 110- to 120-pound transmissions without pain at

29

Carmax. He said that after the crush injury to his right pinkie finger at Carmax, he could not bend his finger. This affected his ability to grip and grasp; his hand and whole arm twitched; his pain level was at a six and a half out of ten; the chronic pain interfered with his ability to sleep and caused him to become easily irritated and to "snap"; and the pain had affected his ability to be a father to his children.

Three experts (Dr. Graybill via his testimony and Drs. Willis and Solomon via Swanigan's medical records from their offices—all treating medical doctors of Swanigan) concluded that Swanigan had RSD/CRPS following the May 18, 2006 on-the-job crush injury to his right pinkie finger. The record contains no controverting evidence on any other producing cause of Swanigan's RSD/CRPS.[12] Dr. Mitchell testified that he found no findings consistent with RSD/CRPS, but he admitted that a crush injury can lead to RSD/CRPS and that a burning sensation, like Swanigan had, that is not explainable by the injury is a hallmark sign of RSD/CRPS.

We hold that viewing all of the evidence—Swanigan's testimony, Dr. Graybill's testimony, as well as the unobjected-to medical records and reports from Dr. Graybill, Dr. Toledo, Dr. Willis, and Dr. Solomon (which document

---

[12]Two experts (Dr. Mitchell and Dr. Chandrakar—both doctors hired by Charter Oak who spent less than ten minutes each with Swanigan and did not touch his hand or arm) concluded that Swanigan did not have RSD/CRPS, but no controverting producing cause evidence exists (as opposed to evidence that Swanigan did not suffer from RSD/CRPS).

Swanigan's exhibition of various signs of RSD/CRPS to various doctors following the May 18 on-the-job crush injury to his right pinkie finger), and the testimony of Drs. Mitchell and Chandrakar—in the light most favorable to the jury's finding that Swanigan's May 18 injury was a producing cause of his RSD/CRPS (because a reasonable factfinder could) and disregarding the contrary evidence—we have located none in the record—more than a scintilla of evidence exists that Swanigan's May 18 injury was a producing cause of his RSD/CRPS. *See, e.g., Cent. Ready Mix Concrete Co.,* 228 S.W.3d at 651; *Liberty Mut. Ins. Co. v. Burk*, 295 S.W.3d 771, 780 (Tex. App.—Fort Worth 2009, no pet.) (holding evidence legally sufficient to support finding that appellee's work-related injury caused his polyneuropathy and foot ulceration); *Hartford Underwriters Ins. Co. v. Burdine*, 34 S.W.3d 700, 707 (Tex. App.—Fort Worth 2000, no pet.) (holding evidence legally sufficient to support finding that appellee's injury to legs and/or feet was producing cause of the total and permanent loss of use of both legs and/or feet at or above the ankles); *Escalante*, 162 S.W.3d at 625; *Am. Cas. Co. of Reading, PA v. Zachero*, No. 11-07-00183-CV, 2008 WL 5205642, at *5 (Tex. App.—Eastland Dec. 11, 2008, no pet.) (mem. op.) (holding evidence legally sufficient that appellee's injury extended to include osteoarthritis and chondromalacia); *Fidelity & Cas. Co. of NY v. Rust*, No. 05-97-001509-CV, 2001 WL 51066, at *4 (Tex. App.—Dallas Jan. 23, 2001, pet. denied) (not designated for publication) (holding evidence legally sufficient to support trial court's judgment because the

jury could have determined from the evidence that appellee's head injury was the producing cause of his mental illness). We overrule Charter Oak's sole issue.

## V. Conclusion

Having overruled Charter Oak's sole issue, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DELIVERED: April 26, 2012